J-S42044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| K.M., | |
| Appellant | No. 442 WDA 2014 |

Appeal from the Order entered February 14, 2014,
in the Court of Common Pleas of Armstrong County,
Civil Division, at No(s): 2012-0483-Civil

BEFORE:  PANELLA, JENKINS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED SEPTEMBER 16, 2014**

K.M. ("Mother") appeals from the Order entered on February 14, 2014, awarding shared legal custody of L.M. ("Child"), a male born in May of 2005 to Mother and M.M. ("Father"), and awarding primary physical custody to Father and partial physical custody to Mother, in accordance with a schedule. We affirm.

The parties were formerly married, separated in 2009, and divorced in

2011.[1]  Pursuant to a consent custody Order entered on October 25, 2012, the parties shared legal custody of Child.  Mother had primary physical custody, and Father had partial physical custody, in accordance with a schedule.

On May 29, 2013, Father filed a Petition to modify the custody Order. On January 24, 2014, the trial court held a custody trial.  At trial, Father testified on his own behalf, and presented the testimony of his current wife, B.M. ("Stepmother"), as well as that of his mother, M.J.M. ("Paternal Grandmother").  Mother testified on her own behalf, and presented the testimony of her mother, J.A.P. ("Maternal Grandmother").  Child was interviewed in chambers.  The trial court also admitted the expert report of the court-appointed psychologist, Donna J. Zaffy, Ph.D. ("Dr. Zaffy"), regarding her psychological evaluations of Child, Mother, Father, Stepmother and Maternal Grandparents.

On February 14, 2014, the trial court entered its custody Order, awarding shared legal custody of Child to Mother and Father, awarding primary physical custody to Father, and awarding partial physical custody to

---

[1] Following the dissolution of the parties' marriage, Mother began dating B.S., and in 2011, B.S. moved in with Mother and Child.  *See* Trial Court Opinion, 2/14/14, at 10.  B.S.'s children also resided with them fifty percent of the time.  *Id*. at 11.  In 2012, Mother and B.S. had a son, B. ("Half-Brother").  *Id*.  The trial court determined that this living arrangement was "toxic and unsafe," as B.S. abuses alcohol and has violent anger outbursts. *See* Trial Court Opinion, 3/25/14, at 2.  The trial court noted that B.S. tried to attack Child twice in Mother's presence.  *See* Trial Court Opinion, 2/14/14, at 7.  In 2013, Mother, Child and Half-Brother moved into Maternal Grandparents' home.  *See id*.

Mother, in accordance with a schedule. *See* Trial Court Order, 2/14/14, at 1-2. This Order changed primary physical custody of Child from Mother to Father. On that same date, the trial court entered an Opinion setting forth the factual and procedural history of the case, as well as the court's bases for its custody Order. *See* Trial Court Opinion, 2/14/14, at 1-25.

Mother timely filed a Notice of Appeal, along with a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

I. Whether the trial court abused its discretion and committed an error of law in giving controlling weight to [Child's] stated preference to reside with Father[?]

II. Whether the trial court abused its discretion and committed an error of law in failing to give adequate consideration to [Dr. Zaffy's] comprehensive, expert report and recommendations[?]

III. Whether the trial court abused its discretion and committed an error of law by failing to consider the full impack [*sic*] of awarding primary custody of [C]hild to Father[,] when[,] by so doing[, C]hild will be relocated away from [M]other [and Half-B]rother[,] with whom he has a strong bond, the history of Father's anger [and] alcohol issues, and Father's desire to retaliate against Mother for the years when she had primary custody of [C]hild[?]

Mother's Brief at 8 (capitalization omitted).

In custody modification cases, our scope and standard of review are as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent

evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Additionally, we have stated,

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In any custody case decided under the Child Custody Act ("Act"),[2] the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S.A. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the "best interests of the child." ***See*** 23 Pa.C.S.A. § 5338. Section 5328(a) sets forth the following

---

[2] ***See*** 23 Pa.C.S.A. §§ 5321-5340. Because the trial in this matter was held in January of 2014, the Act applies to this case. ***See C.R.F.***, 45 A.3d at 445 (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply).

list of sixteen factors that the trial court must consider when making a "best interests of the child" analysis:

**§ 5328.  Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328.[3] Moreover, section 5323(d) mandates that, when the trial court awards custody, it "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." *Id*. at § 5323(d).

In her first issue, Mother argues that the trial court erred in giving controlling weight to Child's stated preference to reside with Father. Mother's Brief at 15. Mother contends that, although a child's wishes are important, they are not controlling in custody matters. *Id*. Mother asserts that a child's preference must be based upon reasons that comport with his

---

[3] Effective January 1, 2014, the Act was amended to include an additional factor at 23 Pa.C.S.A. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).

-6-

best interests, and that where the child is very young or can give no adequate reason for his preference, the trial court is to accord little weight to the child's preference. *Id*. at 15. Mother contends that Child is young (eight years of age), and that he did not articulate emphatic reasons for his preference. *Id*. at 15, 17. Thus, Mother urges, the trial court abused its discretion by relying on Child's stated preference. *Id*. at 18.

> The preference of a child, although not controlling, is a factor to be carefully considered, as long as it is based on good reasons. The child's maturity and intelligence must be considered, and the weight to be given the child's preference can best be determined by the judge before whom the child appears.

*Swope v. Swope*, 689 A.2d 264, 266 (Pa. Super. 1997) (citations omitted).

Here, the trial court identified and discussed each of the sixteen section 5328(a) factors in its Opinion. **See** Trial Court Opinion, 2/14/14, at 19-23. Additionally, the trial court carefully considered Child's preference to live with Father, and found it to be based on good reasons. **See id**. at 23-25. Specifically, the trial court determined that, based on Child's prior "toxic and unsafe" living situation with Mother and B.S., Child feared that Mother could place him in a bad situation if she moved him from Maternal Grandparents' home. **See id**. at 24. Further, the trial court found that Child preferred to live with Father so that he could spend more time with Father, and so that Stepmother could help him with his homework. **See id**. at 20-21. The trial court specifically found that Mother's testimony that she did

not know that Child was afraid of B.S. until after they moved from the home they shared with him, lacked credibility. **See** *id*. at 24 n.1.

We defer to the determinations of the trial court as to the credibility and weight it gave to the testimony of Child and Mother. **See C.R.F.**, 45 A.3d at 443. The trial court's determinations regarding the weight to accord Child's preference do not involve an error of law, and are not unreasonable in light of the sustainable findings of the trial court as to the credibility of Child and Mother. **Id.** Thus, we find no abuse of the trial court's discretion in its affording Child's stated preference weighted consideration as a section 5328(a) factor, as Child's preference was based on good reasons. **See Swope**, 689 A.2d at 266.

In her second issue, Mother argues that the trial court "chose to disregard the comprehensive, well-reasoned and uncontroverted opinion and recommendation of the [trial c]ourt's own expert[, Dr. Zaffy,] and awarded primary custody of [Child] to Father." Mother's Brief at 20. Mother points out Dr. Zaffy's recommendation that Mother retain primary physical custody of Child during the school year, but that Father be awarded an additional custodial weekend per month during the school year. **Id**. Mother claims that the trial court failed to give adequate consideration to Dr. Zaffy's report, and discounted her uncontradicted evaluation. **Id**.

> [W]hen expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact[-]finding discretion if it totally discounts expert evaluation. To say that a court cannot discount uncontradicted evidence, however, is merely to

rephrase the requirement that a child custody court's conclusion have competent evidence to support it. So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of the experts. It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party.

*King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (citations omitted).

The trial court explained its reasons for not following Dr. Zaffy's recommendation that Mother should have primary physical custody as follows:

In recommending that the status quo be maintained, Dr. Zaffy placed great emphasis on Child's close bond with Maternal Grandparents and their availability to care for Child. Dr. Zaffy ignored Mother's stated intention to move from Maternal Grandparents' home in the foreseeable future. She also did not factor in the substantial anxiety that Child feels about moving elsewhere with Mother.

Trial Court Opinion, 2/14/14, at 25 n.2.

Here, the trial court adequately explained its reasoning, and its conclusions are supported by the record. **See id**. Thus, the trial court's decision to rely on the evidence presented at the custody trial, instead of on the recommendation of the court-appointed custody evaluator, was not an abuse of discretion. **See King**, 889 A.2d at 632.

In her third issue, Mother argues that the trial court erred by failing to fully consider the potential impact of awarding primary custody to Father, given that Mother has been Child's primary custodian since the parties'

separation. Mother's Brief at 24. Mother relies on the primary caretaker doctrine in support of her argument that the trial court should have maintained primary physical custody with her. *Id*. at 25. Mother asserts that she has provided Child with a stable and consistent environment, and notes the positive role that Maternal Grandparents have played in Child's life as his caretakers. *Id*. at 26. Mother contends that awarding primary physical custody to Father will result in a change in Child's school, and subject Child to haphazard childcare arrangements. *Id*.

The considerations embraced by the primary caretaker doctrine have been woven into the section 5328(a) factors, such that they have become part of the trial court's mandatory inquiry. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). Furthermore, the considerations that the primary caretaker doctrine sought to address are included implicitly in the section 5328(a) factors. *See id*. (citing 23 Pa.C.S.A. §§ 5328(a)(3) (requiring consideration of "[t]he parental duties performed by each party on behalf of the child."); (a)(4) (requiring consideration of "[t]he need for stability and continuity in the child's education, family life and community life.")). Thus, to the extent that the primary caretaker doctrine required positive emphasis on the primary caretaker's status, it is no longer viable. *See M.J.M.*, 63 A.3d at 339 (stating that "[w]e simply cannot graft the judicially-created primary caretaker doctrine on to the inquiry that the Legislature has established ….").

Here, the trial court addressed the section 5328(a) factors in its Opinion, including factors (a)(3) and (a)(4), before finding that it was in Child's best interests to award primary physical custody to Father. *See* Trial Court Opinion, 1/14/14, at 19-20. We discern no abuse of discretion by the trial court, and affirm on this basis as to this issue. *See id*.

Mother also contends that, absent compelling reasons to the contrary, siblings should be raised together in one household. Mother's Brief at 27. Mother asserts that Child and Half-Brother are very closely bonded, and that Child misses Half-Brother when they are with their respective fathers. *Id*. at 28. Mother argues that there are no compelling reasons to separate Child and Half-Brother, and that the trial court erred by failing to keep Child and Half-Brother together. *Id*.

When considering sibling relationships in making a custody determination,

> the policy in Pennsylvania is to permit siblings to be raised together, whenever possible (the doctrine of "family unity" or "whole family doctrine"). Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development. This policy does not distinguish between half-siblings and siblings who share both biological parents. However, this Court has made clear that the policy against separation of siblings is only one factor—and not a controlling factor—in the ultimate custody decision. In the majority of cases in which this doctrine has been invoked, the children have been reared together prior to separation or divorce of the parents. In cases where the siblings have not been reared in the same household, the force of the doctrine is less compelling.

*Johns v. Cioci*, 865 A.2d 931, 942-43 (Pa. Super. 2004) (some internal citations and quotation marks omitted); *see also Nomland v. Nomland*, 813 A.2d 850, 855-56 (Pa. Super. 2002) (explaining that the general preference to have siblings raised together must yield to the paramount principle that the best interests of the child is the determining factor in a custody case).

Here, the trial court determined that Child's concerns about his stability if he were to remain in Mother's primary physical custody outweighed the concern of separating him from Half-Brother. **See** Trial Court Opinion, 2/14/14, at 23-25. The trial court found Child's stability concerns if he remains in Mother's primary physical custody were compelling reasons for him to live primarily with Father.[4] **See** Trial Court Opinion, 3/25/14, at 7. We discern no abuse of the trial court's discretion in separating the half-siblings.

Lastly, we address Mother's contention that the trial court failed to consider Father's character, conduct, and motivation in seeking modification of custody. Mother's Brief at 30. In particular, Mother cites to 23 Pa.C.S.A. § 5329(a),[5] arguing that the trial court failed to consider Father's three

---

[4] The trial court noted that Child and Half-Brother would be together every other week in the summer. **See** Trial Court Opinion, 3/25/14, at 7.

[5] Section 5329(a) applies to custody actions and requires the trial court to consider whether any party has been convicted of certain alcohol and drug-related offenses. Section 5329(c) requires the judge to perform an initial evaluation to determine whether the party who committed an offense under

convictions for driving under the influence of alcohol, his conviction for possession of marijuana, his continued consumption of alcohol, and his anger management issues. Mother's Brief at 30. Mother contends that the trial court erred by dismissing Father's prior issues with drugs and alcohol without conducting a thorough and in-depth investigation to ensure that awarding primary custody to Father is in Child's best interest. *Id*. at 31. Mother also claims that the trial court failed to fully consider Father's motivation in bringing the present action in view of his testimony that he wished to retaliate against Mother for not being lenient with him when she had custody of Child. *Id*.

Here, the trial court considered Father's prior alcohol and drug issues, and noted that Father's most recent substance abuse conviction was approximately fifteen years prior to the trial. *See* Trial Court Opinion, 3/25/14, at 7. The trial court also observed that Mother similarly used alcohol and drugs with Father in the past. *See id*. Further, the trial court considered Dr. Zaffy's statement in her report that Father's history of drug and alcohol abuse did not pose a threat of harm to Child. *See id*. at 8.

The record reflects that the trial court also took into account Father's history of anger management issues with Mother and Maternal Grandmother, and the fact that Father took an anger management course at the time of the parties' separation, pursuant to a PFA order that Mother

---

subsection (a) poses a threat to the child, and whether counseling is necessary.

obtained against him. ***See id***. at 7-8. The trial court found that there was no evidence that Father cannot control his temper with Child, and noted that Dr. Zaffy expressed no concern about Father's ability to care for Child. ***See id***. at 8.

Finally, the trial court considered Father's trial testimony that Mother should experience what it is like to suffer some loss of time with Child. ***See id***. The trial court found that Father did not exhibit a retaliatory motive in seeking primary physical custody. ***See id***. The trial court was not concerned about Father retaliating against Mother by withholding custody from her, as the trial court had faith in the influence of Stepmother on the situation, and the trial court advised that it would not accept any retaliation by Father. ***See id***. at 8-9.

The trial court's conclusions are supported by competent evidence in the record, and are not unfounded. Therefore, the trial court properly considered the section 5328(a) factors, and determined that it was in Child's best interests to award Father primary physical custody of Child. Accordingly, we affirm the Order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/16/2014

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

M.M.

~~[redacted]~~,

        Plaintiff    :

                  :

     vs.    :  No. 2012 - 0483 - CIVIL

K.M.

~~[redacted]~~,

        Defendant  :

# Pa.R.A.P.1925 OPINION

LEFT FOR ENTRY OR FILING

2014 MAR 25 P 3: 28

BRENDA C. GEORGE
PROTHONOTARY AND
CLERK OF COURTS
ARMSTRONG COUNTY, PA

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

M.M.

_____,          :
                 Plaintiff  :
                            :
          vs.               : No. 2012 - 0483 - CIVIL
K.M.                        :
_____,          :
                 Defendant  :

# Pa.R.A.P.1925 OPINION

VALASEK, P.J.

This is an appeal from the Court's Memorandum and Order dated February 14, 2014 ("the Memorandum"), in which the Court awarded M.M. _____ ("Father") primary custody of the parties' eight-year-old son ("Child"). Prior to that time, K.M. _____ ("Mother") had had primary physical custody of Child pursuant to a consent order dated October 25, 2012.

In her appeal, Mother alleges that the Court committed three errors.

First, Mother asserts that the Court erred by "giving controlling weight to the eight year old child's stated preference to reside with Father."

To the contrary, the Memorandum makes it clear that the Court had various reasons for granting Father primary custody of Child and that Child's preference was not the controlling factor.

 
A major reason for the Court's ruling was Mother's decision to place her relationship with her paramour, **B.S.** ████, over the best interests of Child. As we stated in the Memorandum, "Mother chose to reside with an angry, alcoholic boyfriend for a year and a half, despite the fact that, as Mother herself put it, the relationship was a bad one and got worse over time. Mother decided to keep Child in a toxic and unsafe situation, even after Child told Mother that he was afraid of **B.S.** ████ and that **B.S.** ████ had pushed him." Memorandum, at 24.

Mother decided to leave **B.S.** ████ only after he attempted to physically attack Child in her presence. Mother's decision to remain in an abusive situation adversely affecting Child showed bad judgment and lack of concern for Child's welfare.

By contrast, Father demonstrated his concern for Child by quitting a job that required that he be on the road a great deal, work 19 to 20-hour days, and never know when he would be working. He did this to improve his chances of gaining primary custody of Child and to make himself more available to Child. Father's actions showed the Court that he was willing to go the extra mile to do what was best for Child.

In addition, Child has developed a strong bond with Father's wife, **Stepmother** ████. The importance of this relationship is illustrated by the fact that Child generally makes a big fuss

2

 
when it is time for him to do homework, but not with ▓▓▓▓▓. **Stepmother**

Since Child has so much trouble with reading, spelling and math, **Stepmother** ▓▓▓▓'s ability to work with Child and to motivate him is crucial to his development.

Another important factor in the Court's decision was Child's express fear of moving again with Mother. Child worries that Mother will move back into the house that they shared with **B.S.** ▓▓▓▓.[1] He is adamantly opposed to that because the house holds such bad memories for him. Mother testified that before she would live there again, she would check with Child. Mother did not seem to be aware of Child's strong emotions about the house.

Child specifically told the Court that when Mother moves out of Maternal Grandparents' house, he does not want to go with her. Instead, Child wants to live with Father, or if not with Father, with Maternal Grandparents. Child appears to still be traumatized by having lived with Mother's abusive boyfriend and children.

Child seems uncomfortable with the uncertainty of his future with Mother. Child does not know what third parties he might be living with in the future or where he will live. Father and ▓▓▓▓ are committed to each other and intend to **Stepmother** remain where they live now. This provides Child with a sense of certainty and security that Mother cannot provide.

---

[1] Mother owns the house, but currently rents it.

 
The other factors that influenced the Court's decision are noted in the Memorandum.

Mother avers that the Court erred by "failing to give adequate consideration to the custody evaluator's comprehensive, expert report and recommendations."

To the contrary, the Court gave serious consideration to Dr. Zaffy's recommendations. Dr. Zaffy recommended that Mother retain primary custody of Child and Father have additional weekends with Child during the school year because, she said, she saw no good reason to disturb the status quo.

Her recommendation was based in large part on the fact that Child was living with Maternal Grandparents. Dr. Zaffy was very impressed with them, stating that "[t]he *Maternal Grandparents* ⬛⬛⬛ are able to provide a stable, safe, and secure home environment for both of their grandsons. Since both are retired, they are available to provide child care if [Child] is off school or ill when his mother is at work. In addition, the *Maternal Grandparents* ⬛⬛⬛, both of whom are teachers, are well-equipped to help *Child* ⬛⬛⬛ with his academic challenges." Zaffy Report, at 22.

The Court believes that Dr. Zaffy gave undue weight to the Maternal Grandparents' presence, since Mother plans to move out of Maternal Grandparents' house as soon as she can afford to rent an apartment. Under the status quo, when Mother moves, Child moves with her.

4

 
In addition, Dr. Zaffy was overly impressed with the fact that Maternal Grandparents are professional educators. Dr. Zaffy seemed to think that this would give them some special ability to work with Child on his reading difficulties and school work.

However, Child has continued to struggle with reading, spelling and math, despite the fact that Mother and Maternal Grandparents have been working with him.[2] Maternal Grandmother said that Child fusses and cries whenever it is time to do his homework. He strongly resists doing it. Since *Stepmother* ▇▇▇ has been more successful in working with Child on academics than anyone else, Dr. Zaffy's belief that Maternal Grandparents are best equipped to help him is not supported by the record.

Dr. Zaffy also concluded that "[t]he family session [with **Child, Father and** *Stepmother* ▇▇▇] reflected the **strong bonds** between [Child] and his respect for his father as well as his affection for his stepmother. In short, [Father] is a devoted father who wants to spend time and interact with his son. He and his wife work together to meet [Child's] needs and **provide a stable environment for the child.**" Zaffy Report, at 21 (emphasis added).

---

[2] Maternal Grandmother also said Mother usually helps Child with homework, not her or her husband.

 
By contrast, Dr. Zaffy did not state that Mother provided a stable environment. Instead, she found that "[Mother's] parents … provide a safe, secure environment." *Id.*

Dr. Zaffy further opined that "the concerns father expressed about the living situation when ▉▉▉▉▉▉ *Maternal Grandmother* was with her significant other are moot as she has moved [Child] from that environment." *Id.*, at 22. It is true that Child's living situation has changed, but it is also true that the current living arrangement is a temporary one. Child is acutely aware of that fact and is not looking forward to moving with Mother.

Mother testified that she has a history of choosing abusive men as romantic partners. In her report, Dr. Zaffy congratulated Mother for being in therapy to change that pattern. The Court is glad that Mother is in therapy to work on her tendency to make bad choices. However, it is still not in Child's best interests to have Child remain with Mother. The fact remains that Mother exhibited a willful blindness to Child's mistreatment by her paramour and his children for a significant period of time. Mother subordinated Child's safety and emotional well-being to her continuing desire to live with *B.S.* ▉▉▉▉. The Court will not ignore the implications of that decision.

Finally, Mother alleges the Court erred by failing to fully consider the "full impact of awarding primary custody of

 
the child to Father when by so doing the child will be relocated away from his mother, his younger brother with whom he has a strong bond, the history of Father's anger and alcohol issues and Father's desire to retaliate against Mother for the years when she had primary physical custody of the child."

As the Court explained in its Memorandum, there are compelling reasons for separating Child from his younger half-brother for much of the time during the school year. On the other hand, during the summer, the boys will be together every other week, just as they were before.

With respect to "the history of Father's anger and alcohol issues," the record shows that Father's last run-in with the law for substance abuse was approximately 15 years ago. There is no evidence that Father has had any problems with substance abuse since that time, although there is some evidence that Mother and Father drank and used drugs together until Child was born. Dr. Zaffy indicated that alcohol and drug use was not an issue currently.

As to Father's anger issues, it is true that Father has yelled at Mother and Maternal Grandmother on occasion when he was angry with them. Also, to satisfy a requirement of a Protection from Abuse Order that Mother obtained against Father when they separated in 2009, Father did complete an anger

7


management class. However, there was absolutely no testimony that Father cannot control his temper around Child.

Dr. Zaffy expressed no concern that Father was unable to control his temper. She concluded that "neither the parents, stepmother, nor the grandparents are exhibiting any mental health concerns that compromise their ability to care appropriately for [Child]. All love [Child] and are able to meet his emotional needs." *Id.* Dr. Zaffy also reported that Child is "well-treated and well-cared for by all family members." *Id.*, at 22. In fact, Dr. Zaffy stated that her "primary concerns center[ed] on co-parenting and the difficulty the parents have in communicating about their son." *Id.*

As for Father's stated "desire to retaliate against Mother for the years when she had primary physical custody of the child," Father subsequently testified that he did not intend to retaliate against Mother for what he perceived as her past intransigence regarding custody issues.

In addition, the Court is not concerned that Father will retaliate against Mother for two reasons. First, Father's wife believes very strongly in fostering Mother's relationship with Child and will actively discourage Father from withholding Child from Mother. Second, the Court will not put up with any tit-for-tat behavior by Father if it occurs and will not

8

███████ V. ███████

No. 2012-4083-Civil

hesitate to find Father in contempt of the Custody Order should the facts warrant it.

For all of the above reasons, as well as for the reasons previously stated in its Memorandum, the Court recommends affirmance of its Order.

Respectfully submitted,

Date: March 25, 2014

█████████████████ J.

Circulated 08/27/2014 10:26 AM

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

M.M. ~~████████████~~,

             Plaintiff   :

                    :

K.M. vs. ~~████████████~~,  : No. 2012 - 0483 - CIVIL

                    :

             Defendant  :

## MEMORANDUM and ORDER

NOT FOR ENTRY OR FILING

2014 FEB 14 P 1:48

BRENDA C. GEORGE
PROTHONOTARY AND
CLERK OF COURTS
ARMSTRONG COUNTY, PA

14

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

**M.M.**

~~_____~~,      :

           Plaintiff      :

                         :

      **vs.**      : No. 2012 - 0483 - CIVIL

**K.M.**

~~_____~~,      :

           Defendant      :

## MEMORANDUM

VALASEK, P.J.

Before the Court for disposition is a complaint to modify custody of ~~**Child**____~~, born May 3, 2005 ("Child"). The petition to modify was filed by ~~**M.M.**____~~ ("Father") on May 29, 2013. ~~**K.M.**____~~ ("Mother") currently has primary physical custody of Child pursuant to a consent custody order entered by the Court on October 25, 2012. Father now seeks primary physical custody of Child.

The Court conducted a custody trial on January 24, 2014, at which time the parties appeared, represented by counsel. The Court heard extended testimony from Mother, Father and Child, and brief testimony from other witnesses. The trial record also includes psychologist Donna J. Zaffy's written report ("Zaffy's Report") of psychological evaluations she performed of Mother, Father, ~~**Stepmother**~~, Child, and ~~_____~~ ("Maternal Grandparents").

 
## FACTS

After reviewing the entire record, the Court makes the following findings of fact.

Father, age 41, lives in a house in Clarion, Clarion County on a one-acre lot in town. Mother's residence is located in South Buffalo Township, Armstrong County, approximately 50 miles away from Father's residence. The drive from one house to the other takes approximately an hour and fifteen minutes.

Father is a high school graduate.

Father has worked at Clarion Boards Industry since August 12, 2013. Before working at Clarion Boards, Father worked at B & W Smith Excavating as a foreman setting up gas fields. For the excavating company, he was on the road a lot, worked 19 to 20-hour days, and never knew when he would be working.

Father quit the gas field job to improve his chances of gaining primary custody of Child and to make himself more available to Child. For years, Child has been asking Father if he could live primarily with Father. Father told Child he would do what he could do to satisfy Child's request.

Father now works Monday through Friday from 7:00 a.m. until 5:00 p.m. Father's mandatory hours are from 7:00 a.m. until 3:00 p.m., but Father works extra to receive overtime pay. However, Father is able to leave work if he needs to, so he is

 v. ▓▓▓▓▓▓

No. 2012-0483-Civil

available if Child needs him for some reason. Father works only 2½ miles from his home.

Father married his high school sweetheart, ▓▓▓▓▓ **B.M. ("Stepmother")** ▓▓▓▓▓, on October 1, 2011. They started seeing each other shortly after Mother and Father divorced.

**Stepmother**
▓▓▓▓▓ works for Krause USA, where she has worked for 15 years. She is the manager of customer service and works from 8:00 a.m. until 5:00 p.m. **Stepmother** ▓▓▓▓▓ has some flexibility in her hours.

The summer of 2013 was the first summer that Mother and Father exercised physical custody of Child on a week on/week off basis. Prior to 2013, Mother had primary custody of Child in the summer.

When Father had custody of Child in the summer of 2013, Child was mostly taken care of by Father's mother. Father prefers to have family members take care of Child rather putting him in day care.

Child did attend a neighborhood day care facility approximately two days a week in the summer of 2013. Child loved attending the day care, where about six of his friends also go. The day care facility is very close to Father's house.

Father's mother ("Paternal Grandmother") is Father's first choice for child care because, among other things, Paternal Grandmother has a mentally retarded son, **D.** ▓▓▓▓▓ with

3

 v. ██████
No. 2012-0483-Civil

whom Child loves to play cards. Child and Paternal Grandmother have a very close relationship.

Paternal Grandmother works at WalMart approximately 20 hours a week.

Father's sister ██ R. 's house, Paternal Grandmother's house, and Father's house are places where Father's family gets together for family gatherings. All of Father's family lives within three miles of his home, except for one sister, who lives 30 minutes away in Oil City.

██████ Stepmother met Child approximately one year after Father and ██████ Stepmother began dating. Child opened up to ██████ Stepmother fairly quickly and they get along very well.

██████ Stepmother and Child are inseparable when Child is at Father's house.

██████ Stepmother cooks, cleans, feeds, buys clothes for Child, and helps him with his schoolwork. Father tries to help Child with his schoolwork "a little," but Child prefers to do it with ██████ Stepmother.

Child has difficulties reading. Father and ██████ Stepmother try to make Child read a minimum of 15 minutes a day.

In previous years, Father was not very involved with Child's schooling. In the school year beginning in August of 2013, however, Father and ██████ Stepmother attended the parent orientation and parent-teacher conferences. ██████ Stepmother has also

4



been communicating with Child's school via e-mail. Father looks over Child's schoolwork and papers when Child brings his school backpack to Father's house.

Father has not participated in Child's health appointments in the past. However, he plans to do so in the future.

Stepmother

████ places a great deal of importance on Mother seeing Child. Should Father receive primary physical custody of Child, Stepmother ████ is amenable to Child seeing Mother whenever Child wants.

Father's house is located in the Clarion-Limestone School District. The elementary school that Child would have to attend in that district is an hour's bus ride away from Father's house. Father does not want Child to ride the school bus two hours a day. Instead, if Father receives primary physical custody of Child, he and Stepmother ████ will pay to send Child to Clarion Elementary School, which is just a mile away. Clarion Elementary is operated by the Clarion Area School District.

There are three third grade classrooms at Clarion Elementary School and approximately about 24 or 25 children in each class.

Currently, Child attends school at South Buffalo School in the Freeport Area School District. There are fifteen children in his third grade class.

 v.

No. 2012-0483-Civil

Father wants Child to transfer to Clarion Elementary immediately if Father is granted primary custody of Child. However, he is willing to wait until the next school year to change Child's school if that is what a professional recommends.

If Father gains primary custody of Child, Stepmother ▇ will take Child to Clarion Elementary School in the morning and pick him up in the afternoon. Stepmother ▇ will drop Child off at Paternal Grandmother's house after school. If Paternal Grandmother is not available, Child will stay with R. ▇, Father's sister, or with C. ▇ his 22-year-old niece. Child can also walk to the nearby day care center to be with his friends if he wants to.

According to Father, he raised Child until about the age of three, when Mother and Father separated for good.

When Mother and Father separated in 2009, Mother filed a protection from abuse petition against Father. Under the PFA order subsequently entered, Father was required to attend six weeks of anger management counseling. Father completed the class as required.

The PFA order also contained custody provisions whereby Child lived primarily with Mother and Father saw Child every other weekend.

According to Father, Mother never allowed Father to spend any additional time with Child, even when Father requested

6

 v. ▬▬▬▬
No. 2012-0483-Civil

it, unless Father first agreed to relinquish other time with Child. Mother denied this.

On May 17, 2013, Mother called Father and ▬▬▬▬ [*Stepmother*] to tell them that her live-in paramour, ▬▬▬▬ [*B.S.*], had tried to attack Child twice the previous evening at Mother and ▬▬▬'s [*B.S*] home. Mother told them she had protected Child from ▬▬▬ [*B.S.*] and would never let ▬▬▬ [*B.S.*] hurt Child. Mother stated that Child would never be around ▬▬▬ [*B.S.*] again.

At the time of the phone call to Father, Mother had just removed herself and Child from the house they had been sharing with ▬▬▬ [*B.S.*]. Mother moved herself, Child and ▬▬▬ [*Half-Brother*] (Mother's baby by ▬▬▬ [*B.S.*]) into Maternal Grandparents' house nearby. Mother and Child had lived with Maternal Grandparents before moving in with ▬▬▬ [*B.S.*].

On May 17, 2013, Father informed Mother that he intended to file a protection from abuse petition against ▬▬▬ [*B.S.*] on Child's behalf. Mother did not object.

However, that weekend, Mother and her father called Father to urge him not to file a PFA petition against ▬▬▬ [*B.S.*]. Father filed a petition anyway. A full PFA hearing was conducted in June of 2013. The Honorable Joseph A. Nickleach denied the PFA petition, telling the parties that he believed the matter was a custody issue.

7

 
Circulated 08/27/2014 10:26 AM

When Mother was living with ⬛ *B.S.*, Child never wanted to return to Mother's house after Child's visits with Father. Child told Father he was afraid of ⬛ *B.S.*.

Father was glad when Mother and Child moved back in with Maternal Grandparents because Father knew that Child would be safe and well-taken care of there.

Father has a criminal record consisting of three driving under the influence convictions: one in 1991, one in 1992 and the last one in 1996. Father was also convicted of possession of marijuana in 1999.

Father acknowledged to Dr. Zaffy that he had "a past history of alcohol and drug use including prescription pills (Vicodin)." Zaffy Report, at 13.

Father went to a 28-day drug and alcohol rehabilitation program at ARC Manor after his second DUI arrest. Father also participated in Alcoholics Anonymous "for awhile," but has not done so for the past fifteen years. Father said he now feels comfortable drinking alcohol because through counseling, he has dealt with the problems that caused him to drink excessively. Father testified that he drinks about four beers per week and no longer smokes marijuana. The threat of Father relapsing back to where alcohol is a problem is negligible.

8

 v. ██████

No. 2012-0483-Civil

Based upon his past experience, Father is highly concerned about what kind of man Mother will date when she moves out of Maternal Grandparents' house. Father is also concerned that Mother will move back into the house she lived in with *B.S.* ██████. Such a move would greatly upset Child, who has bad memories of living there.

Father is also concerned about Maternal Grandfather's behavior. Father said Maternal Grandfather sometimes made Child cry when he ("Maternal Grandfather") yelled while watching football. Father also said that Paternal Grandfather said mean things about Father to Child, including that Father brainwashed Child. Father admittedly does not get along with Maternal Grandfather.

Father said it is in Child's best interest to live primarily with him and *Stepmother* ██████ because they can provide Child with a stable, active, and stimulating life, and can surround Child with people who will give Child all of their attention. Father also said it would be better for Child to live in town among his friends rather than to be isolated out in the country- side with Maternal Grandparents. In addition, Child has his own bedroom at Father's house.

Father is bitter about the limited amount of time he has spent with Child since the parties separated in 2009. Father told the Court that if he receives primary custody,

 v. ████

No. 2012-0483-Civil

Mother should be granted custody of Child every other weekend, including in the summer, so that Mother could feel what it has been like for Father to not see Child for two weeks at a time. Father said Mother should just have two weeks extra with Child during the summer, not week on/week off custody. Father later told the Court that he did not mean what he said.

Mother, age 37, lives in a four-bedroom house in South Buffalo Township with her parents, Child and ████ **Half-Brother**. Mother has an undergraduate degree in business management and a master's degree in education.

Mother works as a customer service associate with PNC Bank at Pittsburgh Mills. She has worked there since 2012. Mother works forty hours a week. She works from 8:45 a.m. until 6:15 p.m. two or three days a week. Otherwise, she works from 8:45 a.m. until 3:45 p.m.

Mother is required to work two Saturdays per month. Mother works on the Saturdays that her boys are with their fathers for the weekend.

Mother gets Child ready for school before she leaves for work. After she leaves, Maternal Grandfather makes Child breakfast. When Mother comes home from work, she takes over care of Child and **Half-Brother** ████.

Mother and her former paramour, **B.S.** ████, began living together in November of 2011. Child lived with them in a home

10

█████ v. █████
No. 2012-0483-Civil

owned by **B.S.** █████'s ex-wife located approximately half a mile from Maternal Grandparents' home. **B.S.** █████'s two children also lived at the house fifty percent of the time.

On August 22, 2012, █████ Child's half-brother, was born.

The incident that spurred Mother to leave **B.S.** █████ began with a fight between Child and **B.** █████, **B.S** █████'s older child, on May 16, 2013. **B.S.** █████ and Mother started to argue and Mother called **B.** █████ a liar. The fight turned into a family argument. Mother asked **B.S.** █████ to leave. When **B.S.** █████ refused, Mother called the police, who then came to the house. **B.S.** █████'s ex-wife also came and removed her children.

Later that night, Mother made the decision to move back in with Maternal Grandparents the next day. Child was overjoyed to hear that he was moving back in with Maternal Grandparents. Child excitedly ran up to Maternal Grandparents' van when they arrived the next day to take him, Mother and **Half-Brother** █████ back to their house.

According to Mother, **B.S.** █████ is an alcoholic. Mother stated that her relationship with **B.S.** █████ was "bad" and "got worse over time."

Mother testified that Child did not tell her he did not like living with **B.S.** █████ until after Mother and Child had already moved back in with Maternal Grandparents.

11

**B.S.**

Child has told Mother that he did not like living with ████ and does not want to live in that house again. Child has also told Mother that he wishes to live primarily with Father.

Maternal Grandparents, Mother, and the children live together in the home in which Mother grew up. The house has three bedrooms. Child either sleeps with Mother or in the same room as ████ [Half-Brother]

Mother is the primary caregiver to Child and ████ [Half-Brother] when she is home. Mother takes the children for their medical care.

Maternal Grandparents have always provided babysitting for Child, even when Mother and Child did not live with them.

Maternal Grandfather is a retired teacher and elementary school principal. Maternal Grandmother is a retired German teacher.

Child is close to Maternal Grandparents and enjoys their company.

Child is close to his half-brother ████ and enjoys playing with him.

Child has attended school in the Freeport Area School District since kindergarten and has many friends there. Child cannot walk to see his friends because they hang out in the Borough of Freeport, which is five miles away from Maternal Grandparents' house.

12

Child plays on a basketball team through the family's church. Mother is Child's basketball coach.

Father brings Child to Child's basketball games when Child is staying with Father.

Child is in third grade. He has been struggling with reading and receives special help during the school day pursuant to Title I. There is also after-school tutoring available at school. However, Mother has been told by the school that the after-school tutoring would not be helpful to Child.

Mother works with Child after school to improve his reading, spelling and vocabulary skills. Maternal Grandparents also help Child with his reading and his homework.

There is a Custody Order consented to by Mother and **B.S.** in December of 2013 which gives Mother primary physical custody of **Half-Brother**. **B.S.** has partial custody of **Half-Brother** every other weekend from 9:00 a.m. until 7:00 p.m. on Saturday and on Sunday. **B.S.** also has custody of **Half-Brother** two days during the week.

Mother said she has no plans to leave her parents' home "right now." She testified that she, Child and **Half-Brother** are stable and happy and there is no reason to leave.

Mother said she will not remain at Maternal Grandparents' house indefinitely, however. Eventually, when she has enough money, she plans to move to an apartment.

13

No. 2012-0483-Civil

Mother and the children are welcome to stay with Maternal Grandparents as long as they want. Maternal Grandmother said Mother had not talked to her about any "immediate" plans to leave.

Mother owns the four-bedroom house that she and ~~B.S.~~ *B.S.* previously lived in. Mother currently has a tenant occupying the house. The rent she receives from the tenant pays for her $1,179 monthly mortgage payment. Mother said that before moving back into that house, she would first ask Child if it would bother him to live there again.

Because of Mother's "bad" relationships with Father and ~~B.S.~~ *B.S.*, Mother is seeing a therapist. She is learning how to set boundaries in her relationships with significant others and how to be more assertive.

Mother and Father have worked out a system of communication consisting of text messages and telephone calls. Mother frequently calls ~~*Stepmother*~~, since the two of them get along and communicate calmly. Mother finds talking to ~~*Stepmother*~~ easier than talking to Father.

Mother calls Father or ~~*Stepmother*~~ to inform them of what she has learned at Child's medical appointments.

Mother and ~~*Stepmother*~~ coordinate their vacations with one another. Mother and her family spend a week at the beach in

14



No. 2012-0483-Civil

North Carolina every year; Father and his family spend a week at Myrtle Beach.

Because of the traumas that Child has suffered, Mother supports Child having a full mental health assessment and possible mental health counseling as Dr. Zaffy has suggested.

Both Father and Mother admittedly partied with drugs and alcohol prior to the time Child was born. Father and Mother continued to use drugs and alcohol at times until Child was approximately three years old.

Mother has no doubt that Child loves Father and Stepmother ████, and that Father and Stepmother ████ love Child, too. She is concerned that if Child lives primarily with Father, his reading issues will be totally ignored, he will not be disciplined, and he will lose his strong bond with his little half-brother.

The Court interviewed Child in chambers. The Court agrees with Dr. Zaffy that Child "did not appear to be coached but, rather, to be sharing his own thoughts and feelings." Zaffy Report, at 10.

Child wishes to live mostly with Father because "I like him and I like to see him a lot." Child told the Court, "It would make me feel happy to live with my Dad."

Child said he gets along better with Stepmother ████ than with Mother. He also said that he gives Mother, but not Stepmother ████, a

15

No. 2012-0483-Civil

hard time about having to do his homework. Child likes doing homework with *Stepmother* ███████.

Father and Child read together every night for fifteen minutes before bed. Father told Child he will do homework with Child if Child comes to live with him.

Child said he would have no problem going to a new school and not being around his old friends. Child said he liked making new friends.

Child said he would miss Mother if he lived primarily with Father, so he would like to live with Mother one week on, one week off during the summer. Child said he did worry about Mother missing him when he was with Father in the past.

Child told the Court that he was scared living with *B.S.* ███████ "because he was always mean to me." In addition, *B.S.* ███████'s two children would do "stuff" and put the blame on Child.

Child said Mother knew that Child was scared [when they were living with *B.S.* ███████], but that she still wanted to live with *B.S.* ███████.

Child worries that he might have to live in the same house again that he had lived in with *B.S.* ███████. Child said he did not want to remember what had happened there. He mentioned bad memories of *B.S.* ███████ getting drunk, yelling at him and throwing him on the couch.

16

No. 2012-0483-Civil

Father has told Child that he missed Child a lot when Child was not with him. Father told Child that he sometimes slept on Child's bed when he missed Child. Child misses Father, too, when Child is not with Father.

Asked what disparaging things Mother and Father have said about each other to him, Child replied that Mother just says Father is a lunatic, "that's all." Father says "bad stuff" about Mother sometimes, Child said. Father told Child that he did not like Mother and that Mother was being mean to him.

Dr. Zaffy conducted psychological evaluations of Mother, Father, Child, Stepmother and Maternal Grandparents for the Court.

Dr. Zaffy said, "Child's descriptions of his two families indicate that he has formed positive attachments to both of his parents and his Half-Brother as well as to his stepmother and maternal grandparents." Zaffy Report, at 10.

Child "enjoys interacting with members of the extended families, especially mother's family." *Id.* at 10.

Dr. Zaffy stated, "In summary, … , neither the parents, stepmother, nor the grandparents are exhibiting any mental health concerns that compromise their ability to care appropriately for Child. All love Child and are able to meet his emotional needs." Zaffy Report, at 22. "The primary

17

No. 2012-0483-Civil

concerns center on co-parenting and the difficulty the parents have in communicating about their son." *Id.*

Dr. Zaffy ultimately recommended that Mother retain primary custody of Child and that Father have additional weekends with Child during the school year because she saw no good reason to disturb the status quo. Dr. Zaffy was particularly impressed with Maternal Grandparents, stating, "The Maternal Grandparents are able to provide a stable, safe, and secure home environment for both of their grandsons. Since both are retired, they are available to provide child care if Child is off school or ill when his mother is at work. In addition, the Maternal Grandparents both of whom are teachers, are well-equipped to help Child with his academic challenges." *Id.*

## DISCUSSION

The primary concern in any custody case is the best interests of Child. This best interests standard considers all factors that legitimately have an effect upon Child's physical, intellectual, moral, and spiritual well-being. *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa.Super. 2006).

Section 5328 of the Pennsylvania Child Custody Law, 23 Pa.C.S.A. § 5328(a), provides a list of factors that the Court must consider in making any custody determination. We address each factor separately below.

18

No. 2012-0483-Civil

1. **Which party is more likely to encourage and permit frequent and continuing contact between Child and the other party.** In the past, Mother has been the party less likely to encourage and permit frequent and continuing contact between Child and Father. At present, the Court believes that neither party is more likely to do so than the other. Father has expressed some desire to give Mother a taste of her own medicine. However, Stepmother is a positive influence on Father in this regard and is likely to encourage Child to have extra time with Mother, not less.

2. **Abuse committed by a party or a member of a party's household.** Mother obtained a PFA order against Father in 2009 when Mother and Father separated. Mother told Dr. Zaffy that the PFA was based upon a push that Father gave her. The PFA required Father to take anger management classes. Father complied. In her evaluation of Father, Dr. Zaffy expressed no concerns regarding Child's safety around Father. The Court finds that Father poses absolutely no danger to Child.

3. **The parental duties performed by each party on behalf of Child.** It is not clear who the primary caregiver for Child was prior to separation. Mother has had primary physical custody of Child since the parties separated in 2009. Mother takes Child to see the doctor and helps Child with his homework. Mother has been the parent interacting with Child's school until

19

No. 2012-0483-Civil

the 2013-2014 school year, when Father and [Stepmother] have become more involved.

4. <u>The need for stability and continuity in Child's education, family life and community life.</u> Child is affirmatively asking to change his school, community, and family life. Child seems quite happy at the prospect of doing so. Child remains quite shaken from his experience of having lived with [B.S.], an angry alcoholic, and [B.S.]'s bullying children for a year and a half. Child evidently feels more secure with Father and [Stepmother] than with Mother, whom he foresees will move out of Maternal Grandparents' house, thus subjecting Child to more uncertainty.

5. <u>The availability of extended family.</u> Both Mother and Father have extended family to help out with child care.

6. <u>Child's sibling relationships.</u> Child has developed a solid bond with half-brother[.]

7. <u>The preference of Child.</u> Child has been asking to live with Father and [Stepmother] for years. There is no evidence that Child has been coached or subverted into making this request. Child simply wishes to spend significantly more time with Father. He also likes being around [Stepmother], with whom Child has developed a very strong bond. The strength of Child's relationship with [Stepmother] is illustrated by the fact that Child, by his own admission, makes a big fuss when it is time to do his

No. 2012-0483-Civil

homework, but not when he is with [Stepmother] ████. [Stepmother] ████ is Child's favorite person to do homework with, which is extremely important, since Child has been struggling with reading and does not like to do homework at all.

8. **The attempts of a parent to turn Child against the other parent.** There is evidence that Mother and Father have occasionally tried to turn Child against the other parent by making disparaging remarks in front of Child.

9. **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with Child adequate for Child's emotional needs.** Father is more likely to do so. Father demonstrated a great deal of commitment to Child's welfare when he quit his previous job, which required long hours and frequent absences from home, to make himself available to Child on a daily and consistent basis. By contrast, Mother showed extremely bad judgment and a lack of concern for Child when Mother chose to remain with [B.S.] ████ in the face of Child's expressed fear of [B.S.] ████ and the situation.

10. **Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of Child.** Father is more likely to do so with the help of his wife, [Stepmother] ████.

11. **The proximity of the residences of the parties.** The parties live approximately fifty miles apart.

21

No. 2012-0483-Civil

12. Each party's availability to care for Child or ability to make appropriate child-care arrangements. Each party is available to care for Child when not working. Each party also has the ability to make appropriate child-care arrangements.

13. The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. The parties have a significant level of conflict. It is not clear that either party is more willing and able to cooperate than the other. The Court sees *Stepmother* as a very helpful go-between for the parties at this point. However, it is in Child's best interests that Mother and Father learn to deal with each other directly.

14. The history of drug or alcohol abuse of a party or member of a party's household. Father has a history of drug and alcohol abuse. He does not currently appear to be abusing substances, however. Mother also has some history of alcohol and drug abuse, although not to the extent that Father does. Chances of a relapse by either are negligible.

15. The mental and physical condition of a party or member of a party's household. The parties and the members of their households do not suffer from any mental or physical conditions that significantly affect their abilities to care for Child.

22

No. 2012-0483-Civil

16. <u>Any other relevant factor</u>. In recommending that Child remain primarily with Mother, Dr. Zaffy placed a great deal of weight on Child's bond with his half-brother▆▆▆▆.

It is true that the "general rule is that siblings should not be separated without compelling reasons ...." *Swope v. Swope*, 689 A.2d 264, 265 (Pa.Super. 1997) (citation omitted). However, this policy is "only one factor to be considered in determining the best interests of the child." *Id.* "[A]ny benefit derived from forcing a child to reside with one of its parents solely for the purpose of keeping the siblings together can be outweighed by the detrimental effects on the child who prefers not to live with that particular parent." *Sykora v. Sykora*, 393 A.2d 888, 889 (Pa.Super. 1978). We note, too, that Child and ▆▆▆▆ [Half-Brother] are only half-siblings, not full-siblings.

In the instant case, Child has been thinking about where he wants to live for years. Although Child is close to ▆▆▆▆ [Half-Brother] and Maternal Grandparents, Child has repeatedly stated that he is "OK" with being separated from ▆▆▆▆ [Half-Brother] and Maternal Grandparents and that he places a higher importance on being with Father and ▆▆▆▆ [Stepmother].

Mother testified that she intended to move out of her parents' house and strike out on her own when she has enough money to rent an apartment. Mother emphasized that she did not intend to move out "right now." Maternal Grandmother emphasized

that Mother had not discussed any "immediate" plans to move out. However, to the Court, these carefully chosen words suggest that Mother will be moving out sooner rather than later.

That prospect is what causes Child to be worried about the future. Understandably, given his previous bad experience, Child does not want to move somewhere else with Mother. Child has stated that if and when Mother does move out, he would much rather go live with Father, or failing that, remain with Maternal Grandparents in their home.

The record is clear: Mother chose to reside with an angry, alcoholic boyfriend for a year and a half, despite the fact that, as Mother herself put it, the relationship was a bad one and got worse over time. Mother decided to keep Child in a toxic and unsafe situation, even after Child told Mother that he was afraid of **B.S.** and that **B.S.** had pushed him.[1]

Mother's poor judgment and apparent lack of concern for Child's well-being was not lost on Child. He seems determined not to be put in that situation again. Child wants certainty and security, not uncertainty and insecurity. He prefers to live with Father and **Stepmother**, who have a loving

---

[1] Mother testified that she did not know Child was afraid of **B.S.** until after they had moved out of the house they were sharing with **B.S.**. The Court does not find Mother's testimony to be credible. Child made it clear that he had told Mother that he was afraid, and that she decided to stay with **B.S.** anyway.

24

No. 2012-0483-Civil

marriage and who show every intention of staying put in Clarion. Child's desire is wholly rational.

As shown above, there are compelling reasons for Child to live primarily with Father, despite the fact that he will be separated from ██████.[2] *Half-Brother* Therefore, the Court finds that it is in Child's best interests to live primarily with Father and will award Father primary physical custody of Child.

An appropriate Order will be entered.

_____

[2] In recommending that the status quo be maintained, Dr. Zaffy placed great emphasis on Child's close bond with Maternal Grandparents and their availability to care for Child. Dr. Zaffy ignored Mother's stated intention to move from Maternal Grandparents' home in the foreseeable future. She also did not factor in the substantial anxiety that Child feels about moving elsewhere with Mother.